**FILED**

**JAN 3 0 2015**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Clerk, U.S. District and Bankruptcy Courts**

)
)

Ewa M. Czerska
5802 Massachusetts Avenue
Bethesda, MD 20816

　　　　　　　　　　　　　Plaintiff,

　　v.

*Jury Demand*

Case: 1:15-cv-00129
Assigned To : Boasberg, James E.
Assign. Date : 1/30/2015
Description: Employ.Discrim.

Sylvia Burwell, Secretary　　　　　　　　　)
Department of Health and Human Services　)
200 Independence Ave SW　　　　　　　　　)
Washington, DC 20201,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
Department of Health and Human Services,　)
200 Independence Ave SW　　　　　　　　　)
Washington, DC 20201　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　and　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
The U.S. Food and Drug Administration　　　)
10903 New Hampshire Avenue　　　　　　　　)
Silver Spring, MD 20993　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　Defendants.　　)
　　　　　　　　　　　　　　　　　　　　)

**Complaint and Jury Demand**

## COMPLAINT

　　　　This is an action under the Age Discrimination In Employment Act of 1967 ("ADEA"),

as amended, 29 USCA § 621 *et seq*., Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

USCA § 2000e *et seq*., the Civil Service Reform Act ("CSRA"), 5 USCA § 7101 *et seq*., and the

Administrative Procedure Act ("APA"), 5 USCA §§ 551 *et seq*.  Plaintiff, Dr. Ewa M. Czerska,

seeks declaratory, injunctive, and equitable relief; as well as back pay, front pay, damages for her

out of pocket pecuniary losses, liquidated damages, pre-judgment and post-judgment interest, and reasonable attorney's fees as a result of the adverse employment actions taken against her by her employer, the U.S. Department of Health and Human Services.  Plaintiff claims that she was subjected to a hostile working environment and terminated by Defendant in violation of the ADEA, 29 USCA §§ 623(a) and (d) and 633a(a), Title VII, 42 USCA §§ 2000e-2(a), 2000e-3(a) and 2000e-16(a), the CSRA Management and Employee Relations Act, 5 USCA §§ 7513 and 7702, and the APA, 5 USCA §§ 551 *et seq*., 5 USCA §§ 701-706.  Plaintiff requests a trial by jury on all claims as permitted by law.

## PARTIES

1.  Plaintiff is a citizen of the United States and a resident of Maryland.  Plaintiff was at all times relevant to this case over the age of 40.  Plaintiff holds an MD granted by the Medical Academy in Bialystok, Poland (1971), and obtained a Polish State License to practice medicine, and was in medical practice in Krakow and Warsaw, Poland from1971-1980.

2.  Plaintiff also holds a Ph.D. in Genetics granted by the Scientific Board of National Research Institute of Mother and Child in 1978.

3.  Plaintiff was formerly employed by the Defendant United States Food and Drug Administration (the "FDA), an Agency within the Department of Health and Human Services (HHS), as an interdisciplinary scientist, Biologist, GS-401-13, step 10.

4.  Defendant FDA employed Plaintiff continuously in the competitive service from October 1991 until her removal in April 2011.

5.  Defendant FDA is an executive agency of the United States Government within the meaning of 29 USCA § 633a(a) and 5 USCA § 105.  FDA is headquartered in Silver Spring, Maryland.

6. Defendant HHS is an executive agency of the United States Government within the meaning of 29 USCA § 633a(a) and 5 USCA § 105.

7. HHS is headquartered in Washington, D.C.

8. Defendant Sylvia Burwell is employed as the Secretary of HHS.  Defendant Burwell is being sued in her official capacity.

9. Defendant Burwell is a resident of Washington, DC.

## JURISDICTION AND VENUE

10. This action arises under the ADEA, as amended 29 USCA § 621 *et seq.*, Title VII, 42 USCA § 2000e, the CSRA, 5 USCA § 7101 *et seq.*, and the APA, 5 USCA §§ 551 *et seq.*

11. Plaintiff alleges that the FDA subjected her to a hostile work environment and terminated her employment on the basis of her age, in violation of the ADEA, 29 USCA §§ 623(a) and 633a(a), and on the basis of her sex, and national origin, in violation of Title VII, 42 USCA §§ 2000e-2(a) and 2000e-16(a).

12. Plaintiff also alleges that the FDA subjected her to a hostile work environment and ultimately terminated her employment in retaliation for her ADEA and Title VII complaints in violation of the ADEA, 29 USCA §§ 623(d) and 633a(a), and Title VII, 42 USCA §§ 2000e-3(a) and 2000e-16(a).

13. Furthermore, Plaintiff alleges that the FDA engaged in prohibited personnel practices in violation of 5 USCA § 2302, and terminated her employment for reasons that do not promote the efficiency of the Federal service, in violation 5 USCA § 7513(a).

14. Jurisdiction over Plaintiff's claims of age discrimination in employment is invoked pursuant to 28 USCA § 1343(a)(4) and 29 USCA § 633a(c).

15. Jurisdiction over Plaintiff's claims of sex, and national origin discrimination in employment is invoked pursuant to 28 USCA § 1343(a)(4) and 42 USCA § 2000e-16(c).

16. Jurisdiction over Plaintiff's claims of unlawful retaliation for filing her complaints of sex, national origin and age discrimination in employment invoked pursuant to 28 USCA § 1343(a)(4), 29 USCA § 633a(c), and 42 USCA § 2000e-16(c).

17. Jurisdiction over Plaintiff's claim under the CSRA is invoked pursuant to 5 USCA § 7702(e)(1).

18. Jurisdiction over Plaintiff's claims under the ADEA, Title VII, the CSRA, and APA is appropriate because Plaintiff has exhausted all administrative remedies.

19. On February 28, 2011, Plaintiff filed her formal complaint of age, national origin and sex discrimination, and unlawful reprisal for engaging in protected Equal Employment Opportunity ("EEO") activity, with Defendant FDA's Office of Equal Employment Opportunity.

20. On April 28, 2011, Plaintiff filed a Complaint with the Office of Special Counsel ("OSC") alleging reprisal for whistleblowing. The OSC has taken no action with regard to Plaintiffs Complaint.

21. On March 20, 2012, HHS issued a Final Decision finding no discrimination, and informed Plaintiff of appeal rights only to the Equal Employment Opportunity Commission ("EEOC").

22. On April 25, 2012, Plaintiff timely filed an appeal with the EEOC, and simultaneously filed a Mixed Case Appeal with the Merit Systems Protection Board ("MSPB"). In a subsequent letter to the Commission, Plaintiff notified the Commission that the FDA had failed to properly process her formal EEO complaint as a Mixed Case Complaint. Plaintiff

subsequently withdrew her Appeal with the MSPB and maintained her Appeal with the EEOC.

23. On May 22, 2012, Judge Anthony W. Cummings of the MSPB issued a Decision dismissing Plaintiff's appeal to the MSPB without prejudice, and this decision became final on June 26, 2012. As stated in the May 22, 2012 Decision: "On May 9, 2012, [Plaintiff] filed an unopposed motion to dismiss the instant appeal without prejudice. The appellant explained that she filed her request to dismiss this appeal without prejudice because she wished to pursue the complaint she had filed with the [OSC] alleging the agency's removal action was taken in retaliation for her protected whistleblower activity. She indicated that OSC has accepted her case for investigation. … I find it appropriate to grant the appellant's request to dismiss this appeal without prejudice to re-filing because of the appellant's pending OSC complaint."

24. On October 17, 2014, the EEOC issued a Decision on Plaintiff's Appeal and VACATED the HHS March 20, 2012 final decision. The October 17, 2014 EEOC Decision stated that Plaintiff's EEO Complaint did in fact constitute a "mixed case complaint" (because it involved both adverse personnel actions subject to appeal to the MSPB and claims of unlawful discrimination in violation of Title VII and the ADEA).

25. The October 17, 2014 EEOC Decision ORDERED that within thirty (30) calendar days of the date that the EEOC decision becomes final, the Agency shall issue a new final Agency decision, together with Plaintiff's appeal rights.

26. The October 17, 2014 EEOC Decision notified Plaintiff of her right to file a civil action in an appropriate United States District Court within ninety (90) calendar days following the date of her receipt of the Decision. Plaintiff received the EEOC Decision on October 20, 2014.

27. On January 2, 2015, HHS issued a new Decision, also finding no discrimination, and informed Plaintiff of appeal rights, including her right to file a civil action in United States District Court.

28. Because the EEOC VACATED the March 20, 2012 HHS final decision, no final, judicially reviewable decision was entered with regard to Plaintiff's mixed case EEO complaint within 120 days of the date on which Plaintiff filed her formal Complaint with the FDA.

29. Plaintiff's EEO Complaint is subject to the procedural requirements of 5 USCA § 7702.

30. Under 5 USCA § 7702(e)(1)(B), Plaintiff has exhausted her administrative remedies, and is free to pursue her mixed case complaint in Federal District Court.  (See also Ikossi v. Department of the Navy et al., United States Court of Appeals for the District of Columbia, Case No. 05-5456 (decided February 29, 2008), explaining that under 5 USCA § 7702(e), a U.S. District Court has subject matter jurisdiction over all (i.e., the entirety) of the claims in a mixed case).

31. Declaratory, injunctive, and equitable relief is sought pursuant to 29 USCA § 633a(c), 5 USCA § 702, 42 USCA § 2000e-5(g), and the CSRA.

32. Back pay is available pursuant to 29 USCA § 633a(c); 42 USCA § 2000e-5(g), and the CSRA.

33. Front pay, compensatory damages for Plaintiff's out of pocket pecuniary losses, and liquidated damages are available pursuant to 29 USCA § 633a(c).

34. Costs and attorney's fees may be awarded pursuant to 29 USCA § 633a(c), 42 USCA § 2000e-5(k), the CSRA, and Fed. R. Civ. P. 54.

35. This action properly lies in the United States District Court for the District of Columbia pursuant to 28 USCA § 1391 because a Defendant resides in this judicial district.

## FACTS

36. Plaintiff began working at FDA in November 1987, and in the competitive service since October 1991.

37. Until July 2008, over a period of nearly 17 years, Plaintiff worked under numerous managers at FDA, and none of Plaintiff's managers had ever raised any concerns regarding Plaintiff's job performance or otherwise.

38. Plaintiff is a distinguished physician and scientist who obtained an MD degree and a PhD degree.

39. Plaintiff is a recognized international leader in her field of expertise. Plaintiff served as President of The Bioelectromagnetics Society from 2007-2008. The Bioelectromagnetics Society (BEMS) was established in 1978 as an independent organization of biological and physical scientists, physicians and engineers interested in the interactions of electromagnetic fields with biological systems. BEMS is an international society with members from approximately 40 different countries and regions around the world. It is incorporated as a non-profit organization in the District of Columbia, USA.

40. In May 2008, Plaintiff and five other FDA physicians and scientists wrote to the FDA Commissioner alleging, and providing evidence of, what she and the others reasonably believed to be serious management wrongdoing at FDA's Center for Devices and Radiological Health ("CDRH"), including violation of laws, rules, or regulations, gross mismanagement, gross waste of funds, abuse of authority, and/or substantial and specific dangers to public health or safety. This protected whistleblower activity was notorious at FDA soon thereafter.

41. Plaintiff fully cooperated with an investigation conducted by the Office of the Commissioner beginning in June 2008 and ending in December 2008.  As a result of that investigation, several managers in Plaintiff's chain of command were removed/ transferred from their positions.  This investigation was notorious at FDA soon thereafter.

42. In July 2008, within 6 weeks of her whistleblowing activity, for the first time in her longstanding FDA career, suddenly and without any prior warning, Plaintiff was given a false and fraudulent negative performance evaluation by her supervisors.

43. In October 2008, Plaintiff and eight other FDA physicians and scientists wrote to members of Congress regarding the wrongdoing by managers at CDRH.  This became notorious at FDA through, among other channels, multiple newspaper articles.

44. In January 2009, Plaintiff and eight other FDA physicians and scientists wrote to President Obama's Transition Team regarding the wrongdoing by managers at CDRH, and shortly thereafter, Plaintiff and eight other FDA physicians and scientists began meeting with members of Congress regarding the wrongdoing by managers at CDRH.  This became notorious at FDA through, among other channels, multiple newspaper articles.

45. As early as June 2008, but certainly by January 2009, all FDA managers and employees were well aware that Plaintiff had engaged in whistleblowing activity to the FDA Commissioner and to members of Congress.

46. In January 2009, a new Division Director (Ms. Janine Morris) was appointed as Plaintiff's second level supervisor.

47. In May 2009, the HHS Office of Inspector General began an investigation of Complaints made by Plaintiff and eight other FDA physicians and scientists regarding serious

wrongdoing by managers at CDRH.  This was notorious to all managers at CDRH, including all managers in Plaintiff's chain of command.

48. In June 2009, a new Branch Chief (Dr. Michael O'Hara) was appointed as Plaintiff's immediate supervisor.

49. By July 2009, members of FDA management, including but not limited to Dr. O'Hara and Ms. Morris, were actively creating a hostile work environment for Plaintiff and were actively retaliating against Plaintiff, and were treating Plaintiff in a disparate manner compared to similarly situated younger non-Polish male employees.

50. On August 28, 2009, Dr. Robert C. Smith (who worked in Plaintiff's Branch at FDA) named the Plaintiff as a witness in his EEO complaint.

51. On or about September 10, 2009, Plaintiff was interviewed as a witness by EEO investigator Stuart Gaines (regarding the EEO complaint of Dr. Smith), and this became well known to FDA management shortly thereafter.

52. On December 9, 2009, Dr. Michael O'Hara hand-delivered a 26-page "Notice of Performance Deficiencies and Expectations" to Plaintiff.

53. On December 10, 2009, Plaintiff sent an email to Jeffrey Shuren (copied to FDA Commissioner Margaret Hamburg, then FDA Principal Deputy Commissioner Joshua Sharfstein, and Mr. St. Pierre's immediate supervisor Dr. Alberto Gutierrez) that stated the following (an unredacted version of this December 10, 2009 email was posted online by Defendants in 2012 through Defendants contractor Quality Associates Inc.):

> We met with you in early September and we have provided to you extensive evidence of managerial wrongdoing and a pervasive hostile work environment at CDRH. ... Managers continue to lash out and engage in blatant retaliation. ... These managers are allowed to run the FDA like a Mafia organization-- rather than protecting whistleblowers, we are specifically and knowingly targeted for termination ... and/or various forms of retaliation and reprisal.  For the latest act

of blatant retaliation against me, yesterday ... I was handed a "notice of performance deficiencies and expectations." I worked for FDA for 23 years with fully successful/exceptional performance. ... Is this the environment you wish to create and promote at CDRH? I will treat the "notice" as an act of blatant retaliation and although I will respond to the many false and misleading statements, I will not compromise my integrity as a scientist and a physician.

54. On December 21, 2009, Plaintiff sent an email to Jeffrey Shuren (copied to FDA Commissioner Margaret Hamburg, FDA Principal Deputy Commissioner Joshua Sharfstein, and Mr. St. Pierre's immediate supervisor Dr. Alberto Gutierrez) that stated the following (an unredacted version of this December 10, 2009 email was posted online by Defendants in 2012 through Defendants contractor Quality Associates Inc.):

As you know, since May 2008, my colleagues and I have reported serious wrongdoing by managers at CDRH and we have been subject to ongoing and continuous retaliation. The latest retaliation against me comes in the form of a Notice of Performance Deficiencies and Expectations that was hand delivered to me by Dr. Michael O'Hara (Acting Branch Chief, Radiological Devices Branch) on December 9, 2009. This is particularly disturbing because I have brought directly to your attention the wrongdoing, retaliation, and mismanagement that I ... have suffered from Dr. O'Hara, as well as his supervisor, Ms. Janine Morris. ... Until I first reported management wrongdoing at CDRH in May 2008, I had exemplary performance evaluations at all times.

55. The December 21, 2009 email further stated:

Management retaliation against me began in July 2008 with false statements placed in my mid-year performance evaluation by Dr. Anastacia Bilek (then Branch Chief, Radiological Devices Branch) and Dr. Joyce Whang (then Deputy Director, DRARD). Dr. Bilek was removed as Radiological Devices Branch Chief in September 2008 and replaced by Dr. David Buckles. Dr. Buckles served on a 6-month Detail as Acting Branch Chief, Radiological Devices, from October 1, 2008 through March 31, 2009. In January 2009, after working with me nearly 4 months, Dr. Buckles, a neutral manager with whom I had never worked before, found that the statements made by Drs. Bilek and Whang in my July 2008 mid-year performance evaluation were false and unsubstantiated.

56. After reviewing Plaintiff's performance record, Dr. Buckles stated the following regarding the false statements placed in Plaintiff's 2008 mid-year performance review (as contained in the December 21, 2009 email):

"In July of 2008, at her mid-year performance evaluation, Dr. Czerska received a number of adverse comments. In response, she provided a point-by-point rebuttal for each comment, requesting but apparently not receiving additional information or commentary.  As her supervisor I have not seen documentation that would either support the original comments or refute Dr. Czerska's rebuttals.  My own observation is that Dr. Czerska has been responsive to constructive feedback.  In recent months she has increased both the scope and the volume of her workload.  She has enhanced her verbal and written communication style with industry, and she has voluntarily accepted complex assignments, which she has been especially helpful during a time of significant resource constraints.  My assessment is that Dr. Czerska is a Fully Successful member of the team.  Her performance is consistent with my expectations for her grade and seniority, and her willingness to accept complex or difficult assignments is much appreciated."

57. Plaintiff concluded the December 21, 2009 email by stating the following:

This latest episode of retaliation against me … comes shortly after I have continued (over the past 4 months) to disclose wrongdoing (by Dr. O'Hara, Ms. Morris, and Mr. Joshua Nippers) to senior management at FDA and CDRH, including Drs. Hamburg, Sharfstein, and Shuren, as well as Ms. Kimberly Holden.

Please see the attached letter that fully documents the long-standing retaliation and discrimination that I have suffered from your CDRH managers.  I again ask that you take immediate steps to protect me and other FDA physicians and scientists so that we can do our job to protect the public.

58. On December 23, 2009, Plaintiff contacted the EEO Office to make a Complaint.

59. On or about January 12, 2010, Plaintiff's entire Branch (the Radiological Devices Branch) was moved to a new Office inside CDRH (from the Office of Device Evaluation to the Office of In Vitro Diagnostic Device Evaluation and Safety).  However, Dr. O'Hara was moved with Plaintiff's entire Branch to the new Office so that Dr. O'Hara remained Plaintiff's immediate supervisor.

60. On or about January 12, 2010, Mr. Donald St. Pierre became Plaintiff's second level supervisor, as Mr. St. Pierre was the immediate supervisor for Michael O'Hara.  However, for periods of time between January and August 2010, Mr. St. Pierre acted as Plaintiff's immediate supervisor.

61. On February 4, 2010, Plaintiff filed a formal EEO complaint, naming Dr. O'Hara (and
others) as Responsible Management Officials.

62. Also on February 4, 2010, on or about 1 pm, following cancellation of a face-to-face meeting
between Dr. Czerska and Dr. O'Hara, Mr. St. Pierre entered Plaintiff's FDA office.  Plaintiff
told Mr. St. Pierre that she was uncomfortable meeting with Dr. O'Hara because Dr. O'Hara
has been harassing her, discriminating against her, and retaliating against her for many
months and Plaintiff reminded Mr. St. Pierre that she had just filed a formal EEO complaint
against Dr. O'Hara.  Mr. St. Pierre responded: "that is between you and Michael [O'Hara], I
am not involved in that."  Plaintiff reminded Mr. St. Pierre that he was Dr. O'Hara's
supervisor and that he needed to immediately address her concerns of harassment, retaliation,
and discrimination and that she did not feel comfortable meeting with Dr. O'Hara face-to-
face.  Mr. St. Pierre responded that Dr. O'Hara was "trying to help you with your work and to
improve your reviews."  Dr. Czerska told Mr. St. Pierre that there were no problems with her
work for over 20 years and that Dr. O'Hara's allegations against her were completely false
and unsubstantiated and had been fully rebutted in her response to the Notice of Performance
Deficiencies and Expectations that Dr. Czerska received from Dr. O'Hara (dated December
9, 2009).  Dr. Czerska further stated that there were false statements made by Dr. O'Hara in
the official FDA records for a particular medical device "that were violations of the law that
might even be criminal."  Dr. Czerska urged Mr. St. Pierre to read the administrative record
for the device in question.  Mr. St. Pierre said that he had that file under review.  Dr. Czerska
told Mr. St. Pierre that Dr. O'Hara had refused to respond to her rebuttal.

63. In April 2010, and again in August 2010, Plaintiff amended her EEO Complaint and additionally named Mr. Donald St. Pierre, Dr. Alberto Gutierrez, Ms. Mary Pastel, and Dr. Jeffrey Shuren, as responsible management officials.

64. Therefore, by April 2010, Plaintiff had engaged in the following activities that were notorious at FDA: whistleblowing activity since May 2008; witness in EEO complaints of other FDA employees since September 2009; and filed a formal EEO complaint in February 2010.

65. On April 16, 2010, a letter from the King & Spalding law firm "on behalf of GE Healthcare, a unit of General Electric Company ("GE Healthcare"), was sent to FDA.  The letter stated in part:

> "I am writing on behalf of GE Healthcare, a unit of General Electric Company ("GE Healthcare"), to express its disappointment in the Center for Devices and Radiological Health ("CDRH") for disclosing to the press confidential information in GE Healthcare's premarket notification ("510(k)") submission dated November 26, 2008 and received by CDRH on December 1, 2008.  On March 28, 2010, a New York Times article by Gardiner Harris entitled, "Scientists Say F.D.A. Ignored Radiation Warnings," revealed that '"scores of internal agency documents" regarding GE Healthcare's submission were provided to the New York Times.  GE Healthcare is extremely concerned about this violation of confidentiality and respectfully requests that you conduct an internal investigation into how this information was leaked to the press. …"

66. General Electric is a special interest that does business with the FDA.  General Electric stands to earn millions of dollars if the FDA approves their devices.  Thus, General Electric has a conflict of interest with the Agency's mandate to disapprove medical devices that are not safe or effective.

67. Defendants knew that General Electric has a conflict of interest with the Agency.

    Defendants knew that General Electric was very unhappy with the actions of the FDA

whistleblowers, including Plaintiff that had internally objected to the approval of unsafe and ineffective devices.

68. Acting under the pretext of a legitimate response to a March 2010 New York Times article criticizing the FDA's device review process, Defendants began a secret targeted surveillance program of a small group of FDA employees who had engaged in protected whistleblower and EEO activity, including Plaintiff.

69. Through this secret surveillance program, Defendants discovered that Plaintiff was preparing disclosures for the office of Special Counsel.  Plaintiff made or was in the process of making protected disclosures to the Appropriate Authorities, either herself or through her attorneys or representatives, and with the help of other fellow whistleblowers.

70. By intercepting emails between Plaintiff and her attorneys and representative, Defendants knew that Plaintiff had either already filed, or was about to file, protected disclosures to the OIG, the OSC and the EEO.

71. Defendants reacted by retaliating against Plaintiff, and such retaliation included criminal referrals and removal from federal employment.

72. Defendants' actions constitute prohibited personnel practices that violate Plaintiff's statutory rights, and chill their right to approach the Appropriate Authorities without fear of reprisal.

73. All of the Defendants' searches, seizures, and conversions were performed covertly.

74. All of the Defendants' searches and seizures were conducted without warrants or subpoenas.

75. The Defendants' secret searches were not in the normal course of business.

76. The Defendants' secret searches were targeted to include whistleblowers and those who associated with whistleblowers, and thus included Plaintiff and her representative and attorneys.

14

77. The Defendants' secret searches and seizures lasted for a period of at least one to two years.

78. The Defendants' secrets searches resulted in criminal referrals concerning Plaintiff.

79. The Plaintiff, as well as other targets of the surveillance program were unaware of the existence of the surreptitious interceptions at the time they took place and Plaintiff is still unaware of the full nature and scope of the targeted surveillance.

80. Plaintiff never consented to Defendants' search, seizure or confiscation of her Private Email communications or any other electronic information obtained by Defendants as a direct or indirect result of Plaintiffs' whistleblowing or protected EEO activities.

81. Neither HHS nor FDA informed Plaintiff or employees generally that employees who engage in protected whistleblowing or EEO activity would be subjected to special secret searches targeting whistleblowers and those who engage in protected EEO activity.

82. On or about the interval of time between April 22, 2010 and June 30, 2010, Dr. Jeffrey Shuren authorized the illegal targeted surveillance of a small group of FDA employees who were known whistleblowers and/or who had filed EEO complaints and/or had served as witnesses for EEO Complaints.  As noted above, Plaintiff was one of the FDA employees placed under targeted surveillance, and Plaintiff was a known whistleblower, had filed EEO Complaints, and had served as a witness for EEO Complaints

83. The targeted surveillance of Plaintiff (and others) included the illegal interception of emails sent to and from Plaintiff's private email account, as well as 24-hour a day, 7 days per week, surveillance of all activity on her FDA computer and computer screen, whether Plaintiff was on-duty or off-duty.  This included so-called "snapshot recordings" of the computer screen.

84. Defendants intercepted, seized, and converted private emails and other communications between Plaintiff and Plaintiff's attorneys and representatives.  Defendants used the

intercepted and converted emails and communications to terminate Plaintiff (see below) in violation of the Whistleblower Protection Act and in violation of EEO laws.

85. The electronic communications include, but are not limited to, electronic mail ("email") sent from private, third-party, non-Governmental, password protected, and encrypted email accounts such as Google's email service, "Gmail," or Yahoo's email service, "Yahoo Mail" (hereinafter "Private Email Accounts"). These emails often included attached files and documents. The electronic communications also include emails sent from Private Email Accounts to other Private Email Accounts ("Private Emails"). Private Emails include emails sent from private networks, on private equipment, to other Private Email Accounts.

86. As part of the searches and seizures of electronic communications, Defendants secretly installed or activated spyware on Plaintiffs' government-owned computer, and possibly on other equipment or upon Plaintiff herself. The spyware allowed Defendants to secretly conduct additional surveillance of Plaintiff, including real-time pictures or "screen shots" of Plaintiff's computer screens. The intercepted screen shots enabled Defendants to secretly view information on Plaintiff's computer screens, as well as the computer screens of Plaintiff's representatives or fellow whistleblowers, even if the information was only passing through the computer and not saved on the computer itself.

87. The surveillance resulted in massive numbers of intercepts and screen shots. For example, Katherine Sanders in email to Ruth McKee in referencing the intercepted emails, stated that "I have so many that I don't know that I'd pick the right ones," in relation to the preparation of the Notice of Proposed Removal of Plaintiff.

88. Defendants could intercept emails sent by employees on private email systems from the privacy of the employee's own home.

89. Plaintiff may have been an initial target of the surveillance beginning in April 2010. In the alternative, Plaintiff's correspondence with her representative who was acting as Plaintiff's representative to the Appropriate Authorities at the time, may have triggered targeted surveillance of Plaintiff during that time period.

90. Defendants intercepted and converted drafts of complaints and protected disclosures by Plaintiff and Plaintiff's attorneys and representatives intended to be filed with appropriate authorities including but not limited to, the Office of Special Counsel, the HHS Office of Inspector General, the EEOC, and Congressional Offices (hereinafter collectively referred to as "Appropriate Authorities"). Defendants used the illegal intercepts and seizures to terminate Plaintiff in violation of the CSRA, WPA, and EEO laws.

91. All FDA and HHS employees, including Plaintiff, had explicit permission from Defendants to use their government issued computers for personal purposes.

92. All FDA and HHS employees, including Plaintiff were permitted to use FDA computers for communications intended for the OSC, EEO and OIG, and with a reasonable expectation of privacy when making such communications.

93. All FDA and HHS employees, including Plaintiff, have a statutory right to communicate to the Appropriate Authorities confidentially, including a right to work with a representative in drafting filings for the Appropriate Authorities, which would be filed either directly or by a representative.

94. Defendants secretly searched and seized the private electronic communications sent by and/or received by Plaintiff and her representative, among others, in which Plaintiff and her representative had a right to confidentiality communicate.

95. Defendants secretly searched and seized the private electronic communications sent by and/or received by Plaintiff and her representative.  Plaintiff and her representative expected these communications to be private and confidential.

96. Through screen shots, Defendants secretly learned the names of document files intended for filing by Plaintiff (and others) with Appropriate Authorities.

97. Defendants knew that Plaintiff, either directly or through her representative was working with other employees at the FDA to obtain information that was intended to be filed with the OSC, OIG and/or EEO, and consequently secretly searched and seized the private electronic communications sent by and/or received by Plaintiff and her representative, and others, who were working with Plaintiff.  Plaintiff expected these communications to be private.

98. Defendants' targeted surveillance and intercept program had an internal system for converting employee's private communications into the property of the United States and storing these communications in an undisclosed record system.

99. In intercepts dating back to January 2009, Defendants used a record system with a folder labeled "FDA 9," with sub-directories created for each member of the FDA 9, including Plaintiff.  The FDA 9 were nine FDA employees whom the FDA knew were whistleblowers. Plaintiff was a member of the FDA 9.

100.    The screen shots and other electronic intercepts also enabled Defendants to secretly learn the identity of every whistleblower, and attorneys, with whom Plaintiff in contact.  The screen shots exposed the identity of persons who were providing supporting evidence regarding the claims Plaintiff intended to file with the OSC, and to learn the tactics and strategy Plaintiff and her fellow whistleblowers were using or planning to use in blowing the

whistle on Defendants. These included drafts and filings and disclosures to the OSC, the EEO, and the OIG.

101.    For example, some of the secretly obtained screen shots consisted of a picture of one of the Complainant's computer screen, in which that Complainant had created a sub- directory in the name of each of the members of a whistleblower group that included Plaintiff. Thus, by taking a picture of that screen, Defendants could learn the identity of every whistleblower working with and/or supplying information to Plaintiff and/or her representative.

102.    Other subfolders and subfolder names included documents and document names describing the types of whistleblowing Plaintiff was planning or had engaged in.

103.    Defendants attempted to use the HHS Office of Inspector General as a vehicle to retaliate against Plaintiff and her representative and fellow whistleblowers.

104.    On or about April 28, 2010, the FDA referred a case against Plaintiff and her fellow whistleblowers to FDA's Office of Internal Affairs for investigation, based, as a pretext, on the letter from the representatives of General Electric.  The referral included the Plaintiff. Plaintiff was not informed of this referral.  The purpose of this referral was to retaliate against the Plaintiff (and other fellow whistleblowers) purportedly based on the information that appeared in the New York Times article.

105.    On or about May 17, 2010, Defendants referred the Complaint from Internal Affairs to the HHS Office of Inspector General, desperately trying to open a criminal investigation of the Plaintiff and other whistleblowers.

106.    On May 18, 2010, Scott A. Vantrease, Assistant Special Agent in Charge, Special Investigations Branch, HHS OIG, responded to the FDA's May 2010 referral for a criminal investigation.

107.    Mr. Vantrease noted the complete lack of any evidence of criminal conduct on the part of
        any HHS employee, and specifically noted that the alleged disclosures were protected
        whistleblower activity.  The letter from Mr. Vantrease stated in part: "The referral lacks any
        evidence of criminal conduct on the part of any HHS employee. Additionally, 5 U.S.C. §
        1213, identifies that disclosures, such as the ones alleged, when they relate to matters of
        public safety may be made to the media and Congress . . .

108.    The OIG letter specifically identified the WPA as one of the laws that protected Plaintiff
        and her representative, and informed Defendants that Plaintiff and her Representative
        engaged in disclosures protected under the WPA.

109.    The OIG letter also informed Defendants that there was no evidence whatsoever of any
        criminal conduct committed by any HHS employee, including Plaintiff

110.    Despite the May 18, 2010 letter from the Office of Inspector General indicating that all
        the allegations were of protected whistleblower activity, the FDA continued its illegal
        targeted secret surveillance of the whistleblowers, including Plaintiff, her associates and her
        representative.

111.    This continued surveillance was done in retaliation for Plaintiff's protected disclosures
        under the WPA and EEO laws. The targeted surveillance was knowingly, willfully, and
        illegally ordered to be one under the direction of Jeffrey Shuren.

112.    Based on the letter from the OIG, Defendants knew that Plaintiff had engaged in
        protected activities. Yet, Defendants continued to approve the targeted surveillance of
        Plaintiff, her associates and her representative, in order to obtain evidence that could be used
        as a pretext to fire her or otherwise retaliate against her.

113.    On or before May 16, 2010, Defendants' secretly intercepted emails that included private attorney-client privileged information, which the FDA summarized for attorneys in HHS.

114.    On or about May 21, 2010, Defendants secretly intercepted electronic correspondence and documents that were the personal emails of Plaintiff and her representative. At the time, Plaintiff's representative was assisting Plaintiff in preparing a filing with the Office of Special Counsel.

115.    Although unknown to Plaintiff at the time it happened, on May 16, 2010, a "Snapshot Recording" of the FDA computer of one of the FDA employees placed under surveillance revealed the contents of a Folder named "OSC Filers." The "OSC filers" folder contained subfolders of a group of employees who were making complaints to the Office of Special Counsel (OSC), and one of those subfolders included the name of the Plaintiff. In fact, FDA management officials stole the contents of these folders, including a Draft version of a complaint Plaintiff ultimately filed with the Office of Special Counsel.

116.    On June 10, 2010, Plaintiff sent an email to Dr. Jeffrey Shuren complaining about "continuing harassment and retaliation" against her by Donald St. Pierre. The only action Dr. Shuren took was to immediately forward Plaintiff's email to St. Pierre. The same day, with the help of Dr. Shuren and HHS lawyers, St. Pierre constructed a letter of Reprimand against Plaintiff. On July 1, 2010, Plaintiff received a Letter of Reprimand from Dr. Alberto Gutierrez (Mr. St. Pierre's immediate supervisor) telling her that her "recent e-mails to Dr. Shuren and Mr. St.Pierre are insolent and unnecessary."

117.    On June 28, 2010, Dr. Jeffrey Shuren sent a letter to the HHS Inspector General demanding a criminal investigation of Plaintiff (and other FDA employees) based on the intercepted private emails obtained through the illegal targeted surveillance. The HHS

Office of Inspector General, and the Justice Department, completed an investigation of the Plaintiff and found no evidence of wrongdoing, and took no further action.

118.   On June 29, 2010, Plaintiff sent an email to Dr. Jeffrey Shuren complaining about "harassment and discrimination" that she had suffered and was continuing to suffer at the hands of Donald St. Pierre, and requesting that Dr. Shuren investigate and take actions to protect her. Plaintiff reminded Dr. Shuren that she had filed an EEO Complaint, and that she believed Mr. St. Pierre was engaging in "coercion and intimidation" in an attempt to cause her to change her medical and scientific opinions. Plaintiff further complained to Dr. Shuren that Shuren was ignoring her Complaints against Mr. St. Pierre partly because of differences in "cultural requirements" between Dr. Shuren and herself.

119.   As part of their illegal targeted surveillance program, Defendants have been deleting evidence of their illegal activity, and Defendants took steps to hide the OSC intercepts from their own Freedom of Information Act (FOIA) Office, in order to evade FOIA and other disclosure laws and rules. On June 25, 2010, Mary Pastel wrote an email to FDA management and attorneys, including Jeffrey Shuren, which stated, "please delete the attachments I sent with the version out for review. IT doesn't want them to reside on our server."

120.   In her June 25, 2010 email, the documents Dr. Mary Pastel wants deleted are the attachments for the filing of the HHS OIG criminal referral on or about June 28, 2010, signed by Jeffrey Shuren.

121.   On or about June 28, 2010, the FDA filed a second request for an OIG criminal investigation without the knowledge of the Plaintiff. Jeffrey Shuren submitted the request himself. Attached to the request were several screen shots and documents obtained through

targeted surveillance of the private email correspondence of Plaintiff, her representative, and

other whistleblowers with whom Plaintiff was working to put together a filing for OSC

documenting the misconduct of various FDA managers, including Jeffrey Shuren.

122.    Included in Shuren's June 28, 2010 request for a second OIG criminal investigation were

private electronic communications between Plaintiff, her representative, and other

whistleblowers with whom she was associating and working with on the OSC filing.

123.    On June 28, 2010, Shuren filed his charge against Plaintiff to the OIG.

124.    The timing of these phony and despicable criminal charges constitutes direct evidence of

reprisal under the WPA and EEO by Shuren (and his accomplices) against Plaintiff.

125.    For the next several months, from approximately June 2010 through at least December

2010, the FDA continued its secret targeted surveillance of Plaintiff, and other employees

who supported and/or were working with Plaintiff in planning whistleblower and EEO

disclosures.

126.    On or about August 2, 2010, Defendants intercept a draft EEO complaint being

composed by Plaintiff, with the help of her representative and fellow whistleblowers.  The

intercepted email from the Plaintiff stated in part: "Could you look it over, any changes or

corrections?  It is urgent, since I have to amend my EEO before I elect court hearing"

127.    This draft document was confidential work-product, and contained confidential edits to a

document Plaintiff was intending to file with the EEO.

128.    Defendants knew this was document was confidential EEO work-product, and reflected

the discussions concerning an EEO matter between an FDA employee and her representative,

yet seized the document as part of its illegal targeted surveillance program, converted the

document for its own illicit uses, and shared the document to persons within the agency, including persons who retaliated against Plaintiff.

129.    On or about November 15, 2010, the OIG once again declined to take action against Plaintiff, her representative and/or any of her associates based on information provided by the Defendants to the OIG, including numerous intercepted emails and documents that Defendants obtained as part of the targeted surveillance program.  In its closing letter to FDA, the OIG noted that the Department of Justice ("DOJ") had also declined prosecution of any of the Plaintiff as well as any of the other whistleblowers.

130.    At the same time FDA learned that the OIG and DOJ refused (or were going to refuse) to take any action against Plaintiff, Defendants created a new reason to fire Plaintiff and commenced working on a Notice of Proposed Removal.

131.    On November 24, 2010, Plaintiff sent an email to Dr. Jeffrey Shuren, copied to then HHS Secretary Kathleen Sebelius, FDA Commissioner Margaret Hamburg, and then Principal Deputy Commissioner Joshua Sharfstein, that stated the following:

> Don't you require that your managers follow your own policies and procedures for resolving differences of opinion? If so, it appears that your managers are insubordinate and, in addition, they are being allowed to illegally threaten, harass, and retaliate against me. I have copied Drs. Hamburg and Sharfstein on this email (as well as Secretary Sebelius) so that they might help you stop the misconduct of your managers at CDRH. ...

> You have taken no actions to protect me from retaliation and to ensure compliance with the laws, rules, and regulations. ... Section 7.6 of your SOP states that "The Center Director is responsible for Deciding whether – and, if so, what – corrective actions are necessary for the Center or Offices within the Center to implement in response to a disagreement." Corrective action is clearly needed to protect me from retaliation and to ensure compliance with the laws, rules, and regulations ...

132.    On December 6, 2010, Plaintiff was issued a "Notice of Proposed Removal."  Plaintiff received this notification in a sudden and unexpected manner when Donald St. Pierre and

David Brown came to her office, gave her a copy of the "Notice," and demanded that she

was to vacate her office in 15 minutes (during which time she should assemble her personal

belongings), surrender her FDA computer and identification badge, and be escorted from the

building.

133.    The December 6, 2010 Notice of Proposed Removal was signed by Donald J. St. Pierrre

and stated that "This is advance notice that, in order to promote the efficiency of the service,

I am proposing to remove you from the Federal Service and from your position of GS 0401-

13, Biologist, for Unauthorized Release of Agency information." The Notice stated in part:

> During network monitoring, it was discovered that you have sent internal Agency
> files/ documents and confidential commercial information from your government
> email account ... to a personal email account, ewa.czerska@gmail.com
> (hereinafter, "your personal email account"), using your government-issued
> laptop computer. Further, a review of email account activity revealed that you
> forwarded this same information, using your government-issued laptop from your
> personal email to at least one unauthorized private e-mail address. ...
>
> I have considered, in your favor, that you have twenty-three (23) years of service;
> however your actions are so egregious they have resulted in my having lost trust
> and confidence in you as a Federal Employee.

134.    The statement in the Notice of Proposed Removal regarding "network monitoring" was

completely false. The "evidence" against the Plaintiff had been gathered through the illegal

targeted surveillance program.

135.    The Notice contained eight "Specifications" describing evidence in the form of emails

and email attachments dated between July 12, 2010 and August 17, 2010. The Notice did not

contain copies of the emails or attachments.

136.    On December 13, 2010, attorneys (also referred to as "representatives") acting on behalf

of the Plaintiffs received an email from Catherine Sanders at HHS that included redacted

copies of the "evidence" referred to in the Specifications in the Notice of Proposed Removal.

Despite repeated requests, Plaintiff was never provided unredacted copies of the "evidence"

relied upon by HHS that was used to justify her removal.

137.    This Notice of Proposed Removal of Plaintiff was based solely on documents obtained by

the FDA as part of its targeted surveillance program, after the FDA received the May 2010

letter from HHS OIG informing FDA that their investigation was based solely on allegations

of protected whistleblower activity.

138.    On April 19, 2011, Plaintiff was issued a "Decision on Proposed Removal," signed by

William Maisel.  The Notice stated in part:

I have carefully reviewed the Notice of Proposed Removal, the evidence relied upon, and the
written replies submitted by your representatives.  Based on my review, I sustain the charge
of unauthorized release of agency information.  Further, I have concluded that your removal
is warranted in the facts and circumstances of this matter and to promote the efficiency of the
Federal service.

With respect to your representatives' claim that information was not made available to them,
you have always been aware that Federal statutes and regulations prohibit the release of non-
public information to individuals, who are not Federal employees.  I find that the fact that the
information was provided to your representatives in a redacted format, as required by laws
and regulations, further supports the position that certain information is confidential and
cannot be released to non-agency individuals.  Both you and your representatives failed to
provide me with any evidence that stands for the proposition that commercial confidential
and agency information can be released in an unauthorized manner to private citizens.  I find
that the central issue in the Notice of Proposed Removal is the fact that you sent Agency
information outside of the Agency to non-government email accounts without authorization
and, therefore, disseminated

139.    In other words, the Decision on Proposed Removal explains that Plaintiff was being

removed for "unauthorized release" of "Agency information," but that Plaintiff would not be

provided with the evidence against her because it had to be redacted, and the fact that it had

to be redacted was proof that it was "Agency information" that could not be released.

Therefore, Plaintiff was never provided an opportunity to refute that the materials claimed to

be "Agency information" that could not be released outside of FDA was in fact such information and was in fact precluded from release.

140. Furthermore, neither the Notice of Proposed Removal nor the Decision on Proposed Removal identified any "law" that "specifically prohibited" disclosure of any of the information contained in the Specifications used to effectuate removal of the Plaintiff (see the decision of the Supreme Court issued on January 21, 2015 in DEPARTMENT OF HOMELAND SECURITY, PETITIONER v. ROBERT J. MACLEAN, No. 13-894). In fact, in accordance with the recent Supreme Court decision, Plaintiff's disclosures used to effectuate her removal are protected disclosures, and is further evidence of Defendant's unlawful actions against Plaintiff.

141. All of the information contained in the Specifications used to effectuate the Removal of the Plaintiff was subsequently posted online unredacted to the public, available continuously online for several months in 2012 by HHS through their contractor Quality Associates, Inc. (over a period of time on or about between May and July 2012).

142. In addition, based on documents obtained under the Freedom of Information Act (FOIA), other male employees, including Dr. Jeffrey Shuren, sent emails from their FDA email accounts to private email accounts. On or about September 28 and September 30, 2010, Dr. Jeffrey Shuren sent an email from his FDA email account to the private email account of Dr. Margaret Hamburg, and at least one of the emails had attached numerous non-public FDA documents. Likewise, FDA employees routinely send emails from the FDA email accounts to their own private email accounts that include non-public FDA documents.

143. Furthermore, despite the statement in the Notice of Proposed removal that Plaintiff's activity was "so egregious," and that the "egregious" activity occurred as early as July 2010,

FDA took no action for nearly 6 months. The allegations against Plaintiff in the Notice of

Proposed Removal in December 2010, as well as her ultimate Removal in April 2011, were

nothing more than a pretext for unlawful discrimination and retaliation.

144. On August 6, 2012, an article was published in the Washington Post, entitled "FDA

official charged in connection with prostitution sting; watchdog raises questions about his

role in spying scandal," stated the following:

> Last month, William Maisel, deputy director at the FDA's Center for Devices and
> Radiological Health, was arrested on four counts of soliciting a prostitute and one
> count of disorderly conduct. ... The National Whistleblower Center ... is using
> the arrest to ask whether Maisel's alleged crimes might have affected his work—
> particularly his involvement in a scandal in which FDA officials spied on the
> agency's own scientists who had expressed concerns about the safety of medical
> devices. ... Maisel, according to the whistleblower group, was responsible for
> the final decision to fire Ewa Czerska, one of the targets of a surveillance
> operation in which the agency monitored the computers and communications of a
> group of scientists who were subsequently fired or left the agency and later sued.
> In a letter to the FDA last week, the whistleblower group questioned the propriety
> of a person (that would be Maisel) accused of such a crime snooping around the
> "intimate" details of another employee.

145. On September 20, 2012, William Maisel was found guilty.

146. An April 29, 2011, Notification of Personnel Action (form SF-50) was issued to the

Plaintiff stating the "Nature of Action" as "Removal" (with corresponding Nature of Action

Code indicated as "330") and "Legal Authority" stated as "5 U.S.C. 75 Postappt Eq Adv act-

postappt cond" (with corresponding Authority Code indicated as "V8J"). According to the

Office of Personnel Management (OPM), Chapter 31 of the "Guide to Processing Personnel

Actions" (see http://www.opm.gov/policy-data-oversight/data-analysis-

documentation/personnel-documentation/#url=Processing-Personnel-Actions), codes 330 and

V8J correspond to a "Removal" based on "conduct."

147. On September 23, 2014, Federal Judge Reggie Walton ruled that "targeted surveillance"

is a "disciplinary or corrective action" that "falls within the scope of the CSRA," meaning

that "targeted surveillance" is a prohibited personnel practice within the meaning of 5 USCA § 2302 (See Memorandum Opinion, Civil Action No. 11-1739 (RBW), issued on September 23, 2014).

## COUNT I

## SEX DISCRIMINATION

148.    Plaintiff incorporates by referencing paragraphs 1 through 146 inclusive, and all

allegations contained therein.

149.    Defendant's pattern of disparate treatment of Plaintiff on the basis of her sex constitutes a

violation of 42 USCA § 2000e-2(a).

150.    As a direct and proximate result of the defendants' unlawful sex discrimination, Plaintiff

has suffered substantial harm and is entitled to an award of damages, subject to proof at trial,

as well as injunctive and declaratory relief.

151.    Plaintiff seeks a trial by jury on all issues so triable, injunctive relief, declaratory relief,

compensatory damages, liquidated damages, back pay, front pay, and other damages and

relief resulting from the discriminatory employment actions taken against her on the basis of

her sex, national origin and in retaliation for activity protected under the Title VII of the Civil

Rights Act of 1964, 42 USCA § 2000e *et seq.*

## COUNT II

## <u>NATIONAL ORIGIN DISCRIMINATION</u>

152.   Plaintiff incorporates by referencing paragraphs 1 through 146 inclusive, and all allegations contained therein.

153.   Plaintiff is a Polish-American, of Eastern European origin and a non-native speaker of English.

154.   Plaintiff, although a non-native speaker of English, is, and was at all times relevant to this action fluent in English.

155.   These actions were part of a FDA management pattern of disparate treatment of its nonnative-English speaking employees.

156.   Defendant's pattern of disparate treatment of Plaintiff on the basis of her national origin constitutes a violation of 42 USCA § 2000e-2(a).

157.   As a direct and proximate result of the defendants' unlawful national origin discrimination, Plaintiff has suffered substantial harm and is entitled to an award of damages, subject to proof at trial, as well as injunctive and declaratory relief.

158.   Plaintiff seeks a trial by jury on all issues so triable, injunctive relief, declaratory relief, compensatory damages, liquidated damages, back pay, front pay, and other damages and relief resulting from the discriminatory employment actions taken against her on the basis of her national origin, in violation of 42 USCA § 2000e-2(a).

## COUNT III

## <u>AGE DISCRIMINATION</u>

159.   Plaintiff incorporates by referencing paragraphs 1 through 146 inclusive, and all allegations contained therein.

160.   Plaintiff is, and was at all times relevant to the present action, over the age of 40, and therefore is a member of the class protected by 29 USCA § 631(b).

161.   FDA subjected plaintiff and other FDA employees over 40 years of age to a pattern of disparate treatment.

162.   Defendant's pattern of disparate treatment of Plaintiff on the basis of her age constitutes a violation of 29 USCA §§ 623(a) and 633a(a).

163.   As a direct and proximate result of the defendants' unlawful age discrimination, Plaintiff has suffered substantial harm and is entitled to an award of damages, subject to proof at trial, as well as injunctive and declaratory relief.

164.   Plaintiff seeks a trial by jury on all issues so triable all issues so triable, injunctive relief, declaratory relief, compensatory damages, liquidated damages, back pay, front pay, and other damages and relief resulting from the discriminatory employment actions taken against her on the basis of her age, in violation of the ADEA, 29 USCA § 621 *et seq*.

## COUNT IV

### REPRISAL

165.    Plaintiff incorporates by referencing paragraphs 1 through 146 inclusive, and all allegations contained therein.

166.    As early as September 2009, FDA management were aware of the fact that Plaintiff had served as a witness in an EEO Complaint, and that as early as December 2009 that Plaintiff had FDA contacted the FDA's Office of Equal Employment Opportunity, regarding her allegations of employment discrimination.

167.    Upon discovering that Plaintiff had engaged in activity protected by 42 USCA § 2000e-3(a) and 29 USCA § 623(d) by reporting her allegations of discrimination to the agency's Office of Equal Employment Opportunity, the FDA engaged in a series of unlawful acts of reprisal.

168.    FDA management's pattern of harassment culminated on April 29, 2011, when the agency terminated Plaintiff's employment.

169.    These actions were taken against Plaintiff by HHS management in retaliation for engaging in activity protected by 42 USCA § 2000e-3(a) and 29 USCA § 623(d).

170.    Defendant's pattern of harassment, intimidation, and its ultimate decision to terminate Plaintiff in retaliation for her having filed a complaint of age, national origin, and sex discrimination constitutes a violation of 42 USCA § 2000e-3(a) and 29 USCA § 623(d).

171.    As a direct and proximate result of the FDA's unlawful reprisals, Plaintiff has suffered substantial harm and is entitled to an award of damages, subject to proof at trial, as well as injunctive and declaratory relief.

172.    Plaintiff seeks a trial by jury on all issues so triable, injunctive relief, declaratory relief, compensatory damages, liquidated damages, back pay, front pay, and other damages and relief resulting from the discriminatory employment actions taken against her in retaliation for activity protected under the ADEA, 29 USCA § 621 *et seq* and Title VII of the Civil Rights Act of 1964, 42 USCA § 2000e *et seq*.

## COUNT V

## PLAINTIFF'S TERMINATION DOES NOT PROMOTE THE EFFICIENCY OF THE FEDERAL SERVICE

173. Plaintiff incorporates by referencing paragraphs 1 through 146 inclusive, and all allegations contained therein.

174. Plaintiff's performance reviews demonstrate that Plaintiff's job performance was never rated below an acceptable level by the agency.

175. Plaintiff's contributions as an employee of the FDA have been vital to the mission of the FDA.

176. The stated reasons for Plaintiff's termination in the FDA's Notice of Proposed Removal are discriminatory in nature or are a pretext for unlawful discrimination in violation of Title VII, the ADEA and the APA.

177. The FDA has failed to establish that Plaintiff committed the conduct alleged in its Notice of Proposed Removal.

178. Additionally, the misconduct alleged by the FDA in its Notice of Proposed Removal does not support Plaintiff's termination, in light of her history of strong contribution to the Agency's mission.

179. Defendants have failed to meet their burden of demonstrating that Plaintiff's termination will promote the efficiency of the service as required by 5 USCA § 7513.

180. As a direct and proximate result of the FDA's unlawful termination of her employment, Plaintiff has suffered substantial harm and is entitled to an injunction ordering Defendant FDA to reinstate her to her former position or a position comparable thereto, back-pay, compensatory damages, and her reasonable attorneys' fees.

181.    Plaintiff seeks a trial by jury on all issues so triable all issues so triable, and such

equitable and injunctive relief as is necessary to make Plaintiff whole as a result of the

discriminatory employment actions taken against her by Defendants in violation of 5 USCA

§ 7513.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Dr. Ewa M. Czerska, prays for all damages permitted under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Administrative Procedure Act, including, but not limited to:

(a)     Preliminary and permanent injunctive relief and declaratory relief as appropriate;

(b)     Preliminary and permanent injunctive relief prohibiting future retaliation against Plaintiff and others similarly situated employees for lawful opposition to employment practices prohibited by Title VII and the ADEA;

(c)     An Injunction prohibiting Defendants from taking any disciplinary, adverse or prohibited personnel action against Plaintiff;

(d)     A Judgment declaring that Defendants' conduct towards Plaintiff is in violation of Title VII, 42 USCA §2000e *et seq.*, the ADEA, and 29 USCA § 621 *et seq.*

(e)     An Order requiring Defendants to immediately re-instate Plaintiff to her position as an Interdisciplinary Scientist at the GS-14 level, Plaintiff would have occupied but for Defendants' discriminatory actions;

(f)     An award of the costs and fees incurred by Plaintiff in bringing this action, including those incurred at the administrative level, as well as reasonable attorneys and expert witness fees, and prejudgment and post-judgment interest;

(g)     Compensatory damages, the exact amount to be determined at trial;

(h)     Injunctive relief a declaratory judgment, compensatory damages, and all other appropriate relief pursuant to her Title VII, ADEA, and APA and claims;

(i)     Damages, including back pay and benefits;

(j)     An award for the Plaintiff's costs and reasonable attorneys' fees in this action;

(k)     Compensation for damages to future employment;

(l)     Such other and further relief as the Court may deem just and proper; and

(m)    Plaintiff also requests that the Court maintain jurisdiction over this matter until

Defendants have taken all remedial action.

JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE

Respectfully submitted,

Ewa M. Czerska, PhD, MD
Pro Se
5802 Massachusetts Ave.
Bethesda, MD 20816
301-229-8221

CLERK'S OFFICE                                                          CO-932
UNITED STATES DISTRICT COURT                                          Rev. 4/96
FOR THE DISTRICT OF COLUMBIA

NOTICE OF DESIGNATION OF RELATED CIVIL CASES PENDING
IN THIS OR ANY OTHER UNITED STATES COURT

**FILED**

**JAN 3 0 2015**

Clerk, U.S. District and
Bankruptcy Courts

Case: 1:15-cv-00129
Assigned To : Boasberg, James E.
Assign. Date : 1/30/2015
Description: Employ.Discrim.

NOTICE TO PARTIES:

Pursuant to Rule 40.5(b)(2), you are required to prepare and submit this form at the time of filing any civil action which is related to any pending cases or which involves the same parties and relates to the same subject matter of any dismissed related cases. This form must be prepared in sufficient quantity to provide one copy for the Clerk's records, one copy for the Judge to whom the cases is assigned and one copy  for each defendant, so that you must prepare 3 copies for a one defendant case, 4 copies for a two defendant case, etc.

NOTICE TO DEFENDANT:

Rule 40.5(b)(2) of this Court requires that you serve upon the plaintiff and file with your first responsive pleading or motion any objection you have to the related case designation.

NOTICE TO ALL COUNSEL

Rule 40.5(b)(3) of this Court requires that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify, in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

_____

The plaintiff , defendant or counsel must  complete the following:

I.     RELATIONSHIP OF NEW CASE TO PENDING RELATED CASE(S).

       A new case is deemed related to a case pending in this or another U.S. Court if the new case:  [Check appropriate box(e*s) below.]

       [   ]   (a)     relates to common property

       [   ]   (b)     involves common issues of fact

       [   ]   (c)     grows out of the same event or transaction

       [   ]   (d)     involves the validity or infringement of the same patent

       [X]   (e)     is filed by the same pro se litigant

2.     RELATIONSHIP OF NEW CASE TO DISMISSED RELATED CASE(ES)

       A new case is deemed related to a case dismissed, with or without prejudice, in this or any other U.S. Court, if the new case involves the <u>same</u> parties and <u>same</u> subject matter.

       Check box if new case is related to a dismissed case: [   ]

3.     NAME THE UNITED STATES COURT IN WHICH THE RELATED CASE IS FILED (IF OTHER THAN THIS COURT):

       _____

4.     CAPTION AND CASE NUMBER OF RELATED CASE(E*S).  IF MORE ROOM IS NEED PLEASE USE OTHER SIDE.

**National Whistleblower Center et al** ___ v. ___ **Dept. of Health and Human Services et al** ___ C.A. No. **10-2120 JEB**

_1/30/2015_                    _Eve Cereghl_
DATE                          Signature of Plaintiff /Defendant (or counsel)

2

**FILED**

**JAN 3 0 2015**

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

EWA M. CZERSKA

Case: 1:15-cv-00129
Assigned To : Boasberg, James E.
Assign. Date : 1/30/2015
Description: Employ.Discrim.

VS.

SYLVIA BURWELL ET AL

---

## MOTION FOR COURT APPOINTED COUNSEL

---

I hereby request that the Court appoint counsel to represent me.   I am a pro se litigant in the above captioned case and I have been unable to obtain representation and have limited resources to obtain private attorneys.

Sincerely,

*Ewe Czersl*

Ewa M. Czerska
5802 Massachusetts Avenue
Bethesda, MD 20816

3

**FILED**

**JAN 3 0 2015**

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

EWA M. CZERSKA

> Case: 1:15-cv-00129
> Assigned To : Boasberg, James E.
> Assign. Date : 1/30/2015
> Description: Employ.Discrim.

VS.

SYLVIA BURWELL ET AL

---

### MOTION TO USE CM/ECF Login and Password

---

I hereby request that I be granted an account on the Court's Electronic Case
Files (ECF) system because I am a pro se litigant in case just filed with the
Court.  I wish to have privileges both to electronically submit documents,
and to view and retrieve electronic docket sheets and documents for all cases
assigned to the Electronic Case Files system.

Sincerely,

Ewa M. Czerska
5802 Massachusetts Avenue
Bethesda, MD 20816

4